May it please the court, your honor. My name is Colleen Petty and I represent the appellants Russell Robilee and Hannah Bresewitz. I request ten minutes for my main presentation and five minutes for rebuttal. Okay. And you're really only concerned with the design defect today? Primarily, I would refer the court on the failure to warn and the other issues to our briefs. The only aspect of the failure to warn claim that I would address is the fact that it is predicated upon a finding that a side effect is unavoidable. Okay. But it's the same finding as the design defect. Right. To find that all design defect claims were preempted under the Vaccine Act, the trial court had to ignore four core facts and principles that I'd like to talk about today. First is the express language of the Vaccine Act. The second are bedrock... Wait, wait. I don't want to... That's perfectly fine. Let me let you finish your four points and I'll bring it back to you. Okay. Second, bedrock constitutional and statutory interpretation principles. Well, let me stop you there because that one, I've got a bald spot there as you can see. It's not often scratching my hair with that argument, but a lot of it is. I don't get that. You're talking about where there's a constitutional question that's raised by one interpretation, but not the other. You have to take the path that's traveled, if you will, and take, rely upon the interpretation that doesn't implicate a constitutional principle. How do you get that in this case? I wondered the same thing, too. Your Honor... At least I cut off his hair. Well, Your Honor, I hope I don't lose mine. There are a number of ways of doing that. Three of the courts that have addressed the Vaccine Act have said that the interpretation that we have is a reasonable interpretation of this statute. Wyeth has an alternate interpretation that would result in the statutes or in preemption of design defect claims. Ours would not. The commentators of Comment K, which was adopted by Congress in this act, also envisioned a case-by-case determination. How does that implicate a constitutional claim, case-by-case interpretation, or Comment K? Comment K is really just tied to 402A, and it's an issue of the application of strict liability in this context. How does that implicate the Constitution? Comment K is implicated only to the extent that Congress effectively adopted it and admits that they adopted it and effectively codified it as part of the Vaccine Act, and so that interpretation will inform this Court's decision. Where does that get us in terms of a constitutional issue? It doesn't, and that's the whole point, Your Honor. The Court has two alternative interpretations, one of which does not implicate constitutional issues, which is the one that we talk about. How does the one implicate constitutional issues? How does theirs implicate constitutional issues? Theirs results in the preemption of more claims than would ordinarily be preempted, and preemption is a constitutional issue. Andrew, are you okay? You're saying, do you think it's a supremacy clause? That's correct. Is it a constitutional issue, or does it merely stem from a constitutional provision? The mere source of the doctrine, somewhere in the text of the Constitution, doesn't by itself constitute a violation here, does it? Well, Your Honor, I don't know that it's a violation, but what it does is it preempts claims on the basis of a supremacy clause. Preemption is a constitutional question in the sense that the Congress' power to preempt is based on the supremacy clause, right? Correct, Your Honor, and every court in the cases that they cite and the cases that we cite that has addressed preemption in this very context has said that it's a constitutional issue and that the constitutional avoidance doctrine applies. Every court has said the constitutional avoidance principle applies? Well, we cite cases in our brief. They cite one. I think it was overruled, but nevertheless. We cite cases in our brief where the constitutional avoidance doctrine has been applied to this very circumstance, to preemption of claims. Yeah, but the fact that a constitutional avoidance – I'm talking about conflating issues. The fact that an avoidance issue applies and the source of the avoidance – I'm sorry, the fact that a preemption doctrine may apply and the fact that the preemption doctrine arises from, as Judge Smith said, a provision of the Constitution does not automatically implicate the doctrine that you're relying upon. It doesn't mean that if we interpret it one way, we implicate a constitutional issue and in another way we don't in the way that that doctrine is supposed to operate. Maybe you can go on to your third and fourth argument and come back to this. Your Honor, there may be a way to cut through it. I'm not sure that it's as productive to talk about whether it's a constitutional issue or not. It may be that it has – the constitutional avoidance doctrine has been applied routinely to the question of preemption of claims and interpretations of statutes. And throughout state courts and federal courts, the constitutional avoidance doctrine has been applied where a court is interpreting a statute. You use that as a canon of constitutional – of statutory interpretation? That's correct, and we cite cases in our brief. But second, it goes back again to the Ashwander doctrine, which is even broader than the constitutional avoidance doctrine, and that is that a court may not reach to preempt or reach for a constitutional issue where it has another out. And that's what we're saying in this case, is that this court reached for preemption when it didn't have to. And that's a bedrock constitutional interpretation principle. I have to go back and take another look at the cases you're relying upon. That has never been my understanding of the operation of the doctrine of constitutional avoidance or the importance of the doctrine of preemption vis-a-vis that doctrine. I just – I'm really lost by that argument. But that doesn't mean you're wrong. It just means maybe I'm not with it this morning. I only had one cup of coffee so far. Well, Your Honor, I think that the constitutional avoidance needs to be read in light of the three other doctrines that we cite here. One is that you can't interpret a case or language in a statute to be a nullity, and that is bedrock statutory interpretation principle. The Duncan case out of the Supreme Court says that. Second, it has to be read in the context of the presumption against preemption, which is kind of a side piece of that, which Medtronic, Bates talk about, and which was recently reaffirmed by this court in Colachico. Constitutional avoidance principle comes out of Brandeis' concurrence in Ashwander, reaffirmed in Bates, reaffirmed in McConnell. But you're not – at one point you're arguing that Bates changed the law of the land or the lay of the land. No, Your Honor. Okay. Bates confirmed the law of the land. Okay. Because this is not something – I think the Ferrari Court was somewhat mistaken, and the analysis the Brucewitz Court had was somewhat mistaken about, you know, that somehow Bates was this new and different thing. All it did, I think, was confirm what had been the law since Brandeis wrote his case. Let me take you to – because time is of the essence – to what, to me, is a first thing, and that is if Congress did not intend to preempt design defect claims here, and if, as you have suggested in your brief, and as I understand it to be the thrust of your argument, that courts should engage in case-by-case analysis of preemption. Why pass this statute in the first place? Why pass Section 22B2 in the first place? Your Honor, I think it provided a number of protections and struck a balance that was important. First, it protected companies by having all cases go through the vaccine program first, and thereby weeding out a lot of it. But you could establish the vaccine program in a discrete section of the statute, set up the mechanism, set up the procedure, if you like, and never have to go near this whole notion of unavoidable. You could, Your Honor. And, in fact, they tried to – there was language in an amendment that would have wiped out all the claims. That language was removed, and they put the avoidability language in there. This Court is not at liberty simply to ignore that language. It's in there for a reason. We believe the reason is the reason adopted by a majority of the states, which is to have a case-by-case determination. That's what I wanted to argue with, the case-by-case. Help me understand, how would that work in the context of what Congress is trying to do by passing this Act? If you then allow for a case-by-case inquiry into a design defect, haven't you basically allowed the entire statutory scheme to operate in a way that makes it a novelty, that basically undoes everything that the statutory scheme was there to do? No, Your Honor. It's just the status quo without the statute. No, Your Honor, it is not the status quo. Because what the Vaccine Act did was incorporate into federal law comment K, which wasn't there. And to protect vaccine manufacturers who have made their vaccines as safe as they possibly could. Well, but if you're doing it on a case-by-case basis, that's not where you end up, though. If you're on a case-by-case basis, it means that no matter how careful in theory, the problem, obviously, here is this is a kind of unique products liability slash 428 kind of case. Because no matter how careful they are in designing a vaccine, and generically, not just no matter how good the vaccine is in terms of a social risk, a benefit utility, there's always someone in the target population who may be able to take that vaccine and have a very negative adverse effect from it, even though in the case of smallpox, you may wipe out a devastating disease from the face of the planet. There may be one person out there who gets that disease because of the vaccine. If you allow a case-by-case analysis into the design defect, what motive is there on the part of pharmaceutical companies to get into manufacturing the vaccine to begin with, given the incredible damages that they might be hit with from that one person out there that they cannot design out of the production process, no matter what they do to try? It's a long, rambling question. Do you know what I'm trying to ask? Yes, I think, Your Honor, my light is red, but I'll be very glad to answer the court's question. I think there are a couple of answers to that. Number one is that if the vaccine itself is truly, the side effects are truly unavoidable, that is that there's no alternative to it. Let me give the court an example. Let us assume that the HPV new vaccine that's supposed to prevent cervical cancer is the only one of its kind. There is no alternative to it, and it actually does what it said. If we assume that, then all that would be required, if there was a lawsuit in connection with that, was a showing of those two things, and then we'd be out on our ear. However, if, as in this case, you come in and you show that there were vaccines for 20 years of this sort, and that all that happened was that the manufacturer bought up the patents of its competitors, left a product on the market because it was cheaper, even though it knew it was more dangerous, that's bad public policy. And so what Congress did in considering, for example, an amendment that would have eliminated claims against manufacturers for failure to develop safer vaccines, it specifically took that out. And I think it did that because while it wanted to protect manufacturers, it also wanted to make sure that they were still on the hook if there were safer alternatives that they simply didn't adopt. If you turn it around and say, if you do what the Applees want to do, then what you're saying is that a vaccine that was approved in 1964, and for which there are now many alternatives, that manufacturer has absolutely no obligation to come forward with a new alternative, safer alternative. It can leave that on the market forever and be protected. We often ignore the red light around here, and we're going to do that in this case because there are still questions to be asked, and we need to let our colleague Judge Weiss get in here as well. But I'd like to explore one area that I understand to be central to your argument, and that is that the district court here in fact or effectively applied implied preemption rather than express preemption. And I will concede to you that the district court opinion is not crystal clear. However, I'd like to know whether you can point to any specific reasoning in the district court's opinion that is incompatible with an express preemption determination. Yes, Your Honor. I think that it is, I'm not sure exactly what page it is, but there is a paragraph that we quote at page 18 of our brief where the court says, quote, it finds that section 22B is broader than comment K. And then it goes down to say, so that the Vaccine Act preempts state law determination of whether a vaccine is unavoidably unsafe and therefore entitled to comment K immunity. An FDA approved vaccine design includes the side effects of that vaccine and is therefore by statutory definition an unavoidably unsafe product subject to comment K immunity. As such, section 22 represents part of a comprehensive statutory scheme which preempts all design defect claims brought under state law. That does a couple of things. It implicates field preemption notions. And with due respect to you, Judge Smith, I will quote from Judge Cowan in the Zeneca decision in his dissent where he talks about, specifically has a footnote. It was an excellent dissent. I thought it was an excellent dissent as well. I frankly prefer the majority opinion, but I admire literary quality. We often find that when Judge Smith writes in there, there's a very forceful dissent. I remain open as to the value of that decision, but I thought that the dissent was particularly fine. But in one of the footnotes, he does talk about how these comprehensiveness notions imply field preemption, which is certainly not preserved in this case. Well, there's no mention of field preemption, however, in the district court's opinion. And he doesn't invoke the term anywhere, does he? No, but I think what happens is he acknowledges... That sounds more like a structure and purpose suggestion. Your Honor, it might be if there were a structure or a purpose expressed by Congress, but there really isn't in this act. What he has done is imply from the comprehensiveness of the statute and from, I think, Pennsylvania law, which he's federalized here. Comprehensiveness of the statute really is a structure and purpose argument, isn't it? Well, no, I think he's talking about comprehensiveness of the regulatory scheme, which the court in Hillsborough and McConnell said was not a sufficient basis for preemption. Second, I think he's effectively federalized the Pennsylvania interpretation of Comment K and applied it to the Vaccine Act, which is inappropriate. The reason that I cite this particular paragraph is because I think that he has taken the language and said, I understand what the language says. I understand how the language has been interpreted. I understand that it is a reasonable interpretation or has been held to be so by other courts.  I'm going to preempt the case by case determination. Again, that's the constitutional issue. I'm going to preempt the case by case determination because I find that FDA approval, not just to vaccines, but basically FDA approval itself renders all prescription drugs or all vaccines, at least in this case. We understand your argument and you deserve a good chunk of your time. Correct. Let me just make sure that Judge Weiss doesn't have any questions before we hear from you inside. No, thank you. Nothing at all? Okay. I'll hear then from your opponents and we'll hear back from you. May it please the Court. My name is Richard Mark, Orrick, Harrington, and Sutcliffe, and I represent Weiss, the defendant and respondent on this appeal. Joining me at council table today are Daniel Tomash and John Ewald, also of Orrick, Harrington, and Sutcliffe. I just want to add some excellent practice. To introduce your colleagues at council tables, you would not believe how many times we go through an argument. We see some folks sitting over there. Usually, the one sitting there, especially the younger one, is the one who did all the work on the case. I've worked in a big firm. I kind of know how it flows downhill. And they're never introduced. I just commend you on having that courtesy to your colleagues and us to introduce them. And we work as a team. The younger person on that team may not quite view the team that way. Could I ask you at the outset, would you agree that the district court was not quite as clear as he could have been in indicating the form of preemption analysis that was invoked here? I don't. I think the district court did clearly rely on express preemption. The portion of the opinion referred to by Your Honor, and a part that was cited by counsel for the plaintiff, does contain some language in it that I think implicates the structure, the overall structure of the Vaccine Act. And reference to that overall structure is a valid interpretive tool in determining the scope of the act. But Betty doesn't believe that that really was a structure and purpose strain in the analysis. She's suggesting it really suggests field preemption. And I believe they argued that in the brief as well. They do argue that in the brief. And again, I think that because the district court proceeded from Section 22B1 and the scope of Section 22B1, that it is an express preemption analysis. But regardless of what the district court did, of course, this court reviews the matter for itself. Sure, and let's say in doing that, we find both interpretations of the Section 22B language to be reasonable. And we look to structure and purpose to carry the day here. Can we do that as a matter of express preemption analysis? I would, I think the court could do that. There is a third element I would add. In fact, isn't there language in Medtronic v. Lohr to suggest that we're not confined merely to the plain text for purposes of express preemption analysis, but that we can also bring in structure and purpose for purposes of engaging in express preemption analysis? Sure. The cases that deal with preemption analysis, first and foremost, go back to language stating that the touchstone of any preemption analysis is the intent of Congress. And in seeking congressional intent, the language of the statute, the overall... And if we can resolve that by the plain text, if we can resolve that by the plain language, then it's over. That's fine. But if we can't, we are still looking to intent by going to structure and purpose. That's what you're indicating. Going to that, going to legislative history, which we point out in our brief, is decisively and emphatically in favor of the reading... It is decisive and clear? Absolutely. Because there are not... Please clear up what seemed to me to be something of an explicit and gross, if you will, conflict between the budget committee's subsequent take on this and the authorizing committee's report. Indeed, in Your Honor's description of the two committees, there is a key to the answer. The committee report from 1986 that accompanied the legislation on this bill is the authoritative report that summarizes what Congress thought it was doing when it enacted that. In a subsequent Congress, we have the 99th Congress, we have the 100th Congress. There is our statements in a subcommittee report when action was taken with no relation to this particular part of the statute. Justice Scalia over the years has expressed some real concerns about using certain forms of legislative history for interpretive purposes. And he has both his advocates and his critics on that. But it sure seems to me that the legislative history with respect to this statute points to at least some considerable validity in his complaints in that regard. I have a difficult time finding clarity when I have two disparate congressional views, whether they're written by staff or whether ultimately they did have the imprimatur of the committee members as well. I don't know what to take from that. But you're arguing we have to look to the 86th Congress that enacted the legislation, not a subsequent. That's correct. And there's Supreme Court law that helps identify it. What about the subsequent committee report's suggestion of a failed amendment in the earlier, that is not mentioned in the earlier report, but that took place apparently when the bill was under consideration in the, what was it, Energy and Commerce? I'm trying to remember the authorizing. Not only is the history of that inadequately documented, we don't even have anywhere the real text of this amendment, but taking it- Well, but it happened during markup for the bill, didn't it? It's not at all clear that that is when it happened, indeed. But putting that aside, putting that aside, the way it is described, and all we know about it, and the particular complaint here is that that other version would have addressed the term design defect specifically, whereas the version enacted does not. Our position, and the language of the statute we say, is actually broader and more comprehensive. It was written in a way to eliminate, to remove, to foreclose, the ability to try and get around the civil action bar by putting particular labels on theories. And it fits, again, with the overall structure of the Vaccine Act. But isn't Ms. Petty's reading of 22B-1 at least plausible on its face? No, it is not. No, it is not. Why not? Because- Aren't there a few courts out there which have found that it is? Actually, there are none that have found that it is. The Brucewitz Court and the other courts that I've referenced, this reading has been advanced. Of course, they ultimately come down in the end and say, sorry- Well, I understand they ultimately found preemption. But Sykes, Militrano, Ferrari, didn't they find plausibility at least to the reading that's being urged upon us by a felon suit? I don't think they did. And again, the test, plausibility, is not the test. The notion, for example, that was adopted by the mid-level appellate court in Georgia, that the Bates decision changed and said, as long as someone could come up with a plausible reading, one has to accept that if it disfavors preemption, isn't even what the Bates case says. By the way, is Ferrari on appeal? Ferrari is currently sub judice before the Georgia Supreme Court. That issue is pending out there. But getting back to the question of plausibility, we have to look and take a step back at the overall structure of the Act, the language of Section 22, and the whole notion that if you can suggest something that could be this way, that's not the test. One reason that the argument failed in Bates, if one looks at Justice Stevens' opinion, is he says that the argument advanced by Dow in that case was not more plausible, wasn't more plausible. He was giving sort of the benefit of the doubt. Even if they came up with something here, we're not going to read this relatively obscure provision of FIFRA in a way to wipe out claims that it doesn't look like Congress attended to. But there is nothing to suggest that where the reading advanced, it's not a question of equals competing, whatever, or even some moderate suggestion. It is a question of where is the, you know, what's the... If we have a more plausible reading, and that is consistent with the structure and intent of Congress, that has to govern. Let's assume, let's assume purely for purposes of argument, that this Court determined 22B1 to be ambiguous.  To be ambiguous. Sure. And let's also assume that the two congressional reports, which you seem to see as a seamless, coherent rendition on the part of two committees of the House with respect to the intent of Congress, to rather cancel each other out. Aren't we then, by application of the presumption of, the presumption against preemption, compelled to rule against you? Assuming those two factors, ambiguity and no direction from legislative history. I still don't think so. Because going back to the third element, and we cite and argue from all three in our brief, the language of the statute, legislative history, and the overall structure of the act. Okay, so what can this panel derive from the structure and purpose that helps you here? Let's take a step back and go into the mid-1980s, when the world of litigation and the world of vaccines were very different. This legislation was passed to address comprehensively a crisis in the vaccine supply that was being precipitated by the stress of litigation, and not just results of particular cases, but the transaction costs and the burdens of being in litigation itself. We have focused the entirety of the argument really on this particular clause of express preemption. But the National Childhood Vaccine Injury Act of 1986 is a broader and more comprehensive program. It didn't simply take away and preempt a bunch of claims. It said, what are we going to do to protect the public health? And that includes protecting the vaccine supply. So it creates, first, a program, a national program with advisory boards and expert agencies to research, improve, and develop vaccines. Because you can't have state borders and state policies and state different views of vaccine design saying, we're going to address measles this way here and another way in Idaho, because infectious disease doesn't respect borders. So first, there's the program to say, let's improve vaccines. Second, there's the recognition that vaccines as a biological product can't be rendered reaction-free for absolutely everyone. So they created a compensation program, no fault, relaxed standards of evidentiary admissibility to say, come here and you can get compensation for your injury. Take a hard look at it in that context. And if you're not satisfied, indeed, for any reason, you can come out of that program and have a civil action, but know when you come out that the civil action will be limited in certain ways as described in Section 22 and 23. So the three pieces of this, development of vaccines, compensation, limitation of litigation, have to be seen overall. To say that Section 22, taking, indeed, the notion of vaccine design, the thing that has to be uniform nationwide for the whole thing to work, simply didn't address it would gut the program. And so that is how the structure of the statute informs what this language is supposed to mean. Every one of the claims that is pleaded in the plaintiff's complaint is addressed in some way by the Vaccine Act. How do you then explain the arguably contradictory reports, 186, 187? Or is that how you explain it? One's 86, one's 87? I explain it that one is the 99th Congress, one's the 100th Congress, one's the subcommittee, one from the 87, the 100th Congress, is not the enacting Congress. And it simply has no weight. It should not be followed and disregarded. The, we turn to the language of Section 22, and we see in that that it commands state law applies, except where it is specifically limited by the language of B, C, and E. We say that 22B specifically takes care of and removes, eliminates all claims for civil liability, not by label, not by rubric. But it says that the only way one could ultimately have a claim is to the extent that the vaccine was either made improperly or it didn't have proper directions and warnings. I see that my time is up. Well, let me just make sure that Judge Weiss has no questions. Judge Weiss, any questions at all? No, your questions have answered the problems that I saw. Okay. Thank you. May I have one brief comment on the other? While we let Ms. Pettigrew over, one brief comment. I know I shouldn't have had to do that because a brief comment will not be brief. But why don't you take about 30 seconds and go ahead. Sure. It is clear on the summary judgment record that the failure to warn claim and the manufacturing defect claim were both properly dismissed. I would note that under the Vaccine Act, failure to warn again focuses on what did the company tell the FDA? Very specifically in this action, the plaintiffs initiated an action alleging that information was withheld from the FDA. When they amended their complaint, they withdrew that. There isn't a shred of evidence that any information was withheld from the FDA. And that's why that claim is preempted. Thank you. There's also no evidence of manufacturing defect. Unless I focus my comments on Ms. Pettigrew and the design defect. She's relying upon a rule. She hasn't waived or abandoned the other ones. But I think the thrust here is the design defect. I just want to make sure Your Honor had that addressed. Okay. Thank you. Thank you. I'd like to talk about the legislative history because I think that it is, in fact, consistent, but consistent with our opinion. The 87... You both see consistency in these seemingly disparate... I've got to go back and read them. Your Honor, I can lead you through the wilderness. Thank you, Your Honor. I'm glad someone... Many have tried. Many have failed. That's true. Well, I'll give it my best effort. The 1987 committee report is crystal clear on this issue. It says, quote, the committee stresses that there should be no misunderstanding that the act under to decide as a matter of law whether vaccines were unavoidably unsafe or not. The question is left to the court to determine in accordance with applicable law. Couldn't be clearer. Yeah, but the Supreme Court said in Oscar Meyer, it is the intent of the Congress that enacted the section that controls. That's the 86 report, not the 87 report. So how can we use the report you're pressing to us without relying what the Supreme Court has told us about how we're supposed to use legislative... Well, Your Honor, in Brown and Williamson and Cardozo-Fonseca, they say that even a subsequent Congress who makes an expression of purpose should be taken into consideration. But second and more important... So it gets clearer and clearer and clearer. Not only did the congressional reports conflict with one another, but now you're saying the Supreme Court conflicted. Well, I'm not sure that they do because I think we distinguish the Oscar Meyer case. I don't think it says exactly that. I just read you a quote from 431 U.S. 3245. In any event, I don't think it's a subsequent Congress because the act was not effective until 1988. And the Congress in 1987 was the one who actually rendered the act effective. What does the Budget Committee do other than see that an appropriate amount of money is ultimately appropriated for this purpose and not authorized? Your Honor, that's a critical part of this since it's a compensation program. It's a critical part of this. But up until the time that it was effective, the Congress could have changed the language, et cetera. In any event, the language of the act and amended the act up until that point. Frankly, they could have done it afterwards. But what I'm saying is that it was all of a piece. Yeah, but if they didn't amend the act after the 87 report with language which is intended for the 86 report, doesn't that reinforce what I did quote to you from Oscar Meyer in terms of the effect we should give to the 87 report? I'm not sure that it does, Your Honor. I'm not sure that it does because I think that, as I say, I think subsequent cases say that the cases that they cite were very remote in time. This is effectively at the same time. This is not a Monday morning quarterbacking. There is language in that report that says both now and at the time that we passed it, we had the same thought in mind. But again, I think there are cases which would do that. And I think that this court basically would ignore it. It's peril, that language. But more important, even the legislative history that they cite, if you look at the entire quotation, and I think I commend to you pages 886 and 887 of the record, which have the full citation, not the truncated one that you get there, all of them speak in terms of what happens after you've made the determination of whether a vaccine is unavoidably unsafe or not. In that case, you're completely out. And so I think they are consistent in the sense that this is, the 87 piece is the only one that speaks to that actual decision-making. The 86 version talks about what you do after you've made that determination. So they're not inconsistent in that sense. I'd like to talk then in the- I hate to sound cynical, but it sure looks like the successful move of a lobbyist to me who couldn't manage to get language in the report the first time around, but managed to get it in the second time. Your Honor, I think what may well have happened is that drug companies like Wyeth tried to take the legislative history out of context, which is precisely what they've done here. And maybe there was a clarification before the act became effective. But whatever the source of it, Congress has spoken very clearly in the 87 amendments. I'd like to talk about comprehensiveness for a moment because again, I think it's a field preemption motion, but the Hillsborough and Medtronic cases basically say that simply because you have a regulatory structure is not in and of itself a reason to find preemption, particularly where you do it in contravention of the express language of the act. And I think finally here we have a perfect- Language here is very, seems all inclusive. No manufacturer shall be liable for damages arising out of, this is from 22E1. Your Honor- Pretty all-inclusive language, isn't it? Your Honor, it's inclusive language, but it also includes the unavoidability language. And this court, I don't think, can simply ignore that. Regal says that that's the touchstone. It was reaffirmed in Judge Ambrose's dissent in Polachico that that is the best indicator of congressional intent is what they say. And they said that they would only preempt claims where there is a fine, where they're unavoidable. If you're right about that, if we read it that way, then doesn't the insertion of that phrase basically mean they didn't do anything at all? It's Macbeth full of sound and fury signifying nothing. This is a tale told by an idiot. No, Your Honor, there's two comments I want to make, just before my- That's not a mixing of metaphors, but a mixing of literary illusions, I think. I haven't heard that before. Your Honor, I'm not sure about that. Before I end, I do want to mention something on, I will answer the court's question, but I do want to mention something on comprehensiveness. The FDA, in this case, was asked whether or not these cases were preempted, whether these design defect were. So they could have said, this is part of our comprehensive scheme. They didn't. They said, we don't need to administer these programs. And that's in the record. Judge Baleson specifically asked them that question. So when the FDA was asked, come in, tell us that you need to do this. They said, we don't administer that. I think then this court would have a very hard time in saying that this is part of a comprehensive scheme when even the FDA doesn't say it. But let me answer the court's question to the extent that, that, you know, I remember what it is, which actually I don't now. I'm sorry. I apologize. I just remember sound and fury signifying nothing, but that's what I will answer if I don't get the question repeated. I'm sorry. But no, I think you answered it actually, without realizing you're answering, you did answer it. Okay. Judge, do I have any questions at all? 96 grand, 96 grand. Okay. Thank you, Ms. Petty. Very interesting argument in a very complicated, very important case. We'll take the matter into the advisory. Thank you very much.